**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

Brian J. Reilly,

               Plaintiff,                               **Case No. 2:13-cv-372**

      v.                                           **Judge Graham**

Domenick Meffe, et al,                  **Magistrate Judge Abel**

               Defendants.

**<u>OPINION AND ORDER</u>**

This matter is before the Court on the Defendants' Motions to Dismiss (docs. 8, 11, 15, 19, 20, 24) and the Plaintiff's Motions to Strike (docs. 22, 23, 25). For the following reasons, the Court will: (1) DENY the Defendants' Motions to Dismiss (docs. 8, 11, 15, 19, 20, 24) and (2) DENY AS MOOT the Plaintiff's Motions to Strike (docs. 22, 23, 25).

**I.      Background**

The Plaintiff, Brian Reilly, is a principal in the company Transact Partners International LLC (Transact). Second Am. Compl. at ¶ 8, doc. 18. The Defendants, Domenick Meffe and Richard Hoffman, are principals in the company Wellington Resources LLC (Wellington). <u>Id.</u> On January 31, 2011, Wellington and Transact, non-parties in the present suit, executed a co-brokerage agreement that promised Transact 2% of the total transaction price of the sale of Beck Energy Corporation assets if Transact identified and presented a successful buyer of those assets. <u>Id.</u> Transact successfully procured a buyer for the Beck Energy assets. <u>Id.</u> at ¶¶ 11–12.

Following the success of this transaction, the business relationship between Reilly, Meffe, and Hoffman (the parties) developed through the exchange of industry information and contacts. <u>Id.</u> On May 31, 2011, the parties discussed creating a more formal partnership in which

1

they would split profits from any transaction equally between the three members. Id. at ¶ 12. The parties allegedly confirmed the partnership agreement through an exchange of e-mails. Second Am. Compl. at ¶ 12.

After May 2011, the alleged partnership executed a number of business transactions involving the sale of oil and gas rights throughout Ohio. Id. at ¶¶ 18–26. The Plaintiff worked to market the partnership deals among his industry contacts. Id. at ¶ 18. During the course of 2011, the Plaintiff marketed twelve deals on behalf of the alleged partnership. Id. Meanwhile, the Defendants solicited oil and gas leases from leaseholders and executed the sale of oil and gas leases owned by the alleged partnership. Id. From May through November 2011, Defendant Meffe and the Plaintiff were in contact on a daily basis. Id. at ¶ 21. All three members of the alleged partnership met in person or held conference calls at least twice a week to discuss partnership business and to calculate prospective profits that would be distributed to each member of the alleged partnership. Id.

The alleged partnership's first transaction involved the transfer of oil and gas rights for land in the City of Girard, Ohio. Id. at ¶ 20. On November 26, 2011, the net proceeds from the transaction were split three ways between the parties. Id. In the fall of 2011, the Defendants purchased oil and gas rights to approximately 4,400 acres of land in Monroe County, Ohio (the Massey Assets) from an Ohio limited liability company. Id. at ¶ 22. The Plaintiff then marketed the Massey Assets and a number of smaller leases in Belmont County (the Belmont Assets) to a variety of oil and gas companies. Id. at ¶ 23.

On December 19, 2011, the Defendants conveyed the Massey Assets to XTO/EXXON without notice to the Plaintiff. Id. at ¶ 26. The sale of the Monroe County leases resulted in a profit of $7,321,107.00 for the alleged partnership. Id. at ¶ 26. Also in late 2011, the Defendants

sold the Belmont Assets without notice to the Plaintiff. Id. The sale of the Belmont Assets resulted in a profit in excess of $600,000.00 for the alleged partnership. Id. The Defendants did not split the profits from the sale of the Massey Assets or the Belmont Assets with the Plaintiff. Id. After learning of the closing of the Massey Assets in January 2012, the Plaintiff confronted the Defendants regarding the distribution of the alleged partnership's profits. Id. at ¶ 27. Defendant Meffe informed the Plaintiff that he would not be paid a partnership share, which Defendant Meffe's counsel subsequently confirmed after discussions with the Plaintiff. Id.

On July 29, 2013, the Plaintiff filed a six count Complaint (doc. 2) against the Defendants alleging: (1) Breach of Contract; (2) Breach of Fiduciary Duty; (3) Conversion; (4) Intentional and/or Fraudulent Nondisclosure; (5) Unjust Enrichment; and (6) Accounting. In lieu of an Answer, the Defendants have filed multiple Motions to Dismiss. The Defendants move to dismiss the Complaint, arguing that: (1) the Plaintiff's Complaint fails to state a viable partnership claim against the Defendants; (2) in the alternative, the present lawsuit is covered by a private arbitration agreement; and (3) in the alternative, the Southern District of Ohio is an improper venue for the present action.

## II.     Motion to Dismiss for Improper Venue

The Court first addresses the Defendants' claim that venue in the Southern District of Ohio is improper in this case. See Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2nd Cir. 1963) (en banc) (recognizing that district courts should resolve issues related to jurisdiction or venue prior to ruling on a motion to dismiss for failure to state a claim).

The Defendants maintain that the Southern District of Ohio is an improper venue for this case and that this action should be transferred to the District Court for the Western District of

Pennsylvania pursuant to 28 U.S.C. § 1406(a).[1] In support of this contention, the Defendants argue that none of the parties are residents of the Southern District of Ohio. Moreover, the Defendants emphasize, the Plaintiff's claims are based on the Defendants' conduct in Pennsylvania.

In response, the Plaintiff maintains that venue is appropriate in the Southern District of Ohio. The Plaintiff contends that all of the oil and gas leases involved in the transactions in this dispute were located in Ohio. Further, the Plaintiff notes, every partnership transaction involved Ohio citizens and corporate entities, many of whom will be necessary witnesses in this case. Invoking 28 U.S.C. § 1391(b)(2), the Plaintiff asserts that "a substantial part of the events or omissions giving rise to the claim occurred" in the Southern District of Ohio.

The Defendants have moved to dismiss this case for improper venue under Federal Rule of Civil Procedure 12(b)(3). "[W]hether venue is wrong or improper . . . is generally governed by 28 U.S.C. § 1391." Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. of Tx., 134 S. Ct. 568, 577 (2013) (internal quotation marks omitted). Under 28 U.S.C. § 1391(b), a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b)(1)-(3). If venue is not proper under one of these three categories, the case must be dismissed or transferred under § 1406(a). Atl. Marine Const. Co., Inc., 134 S. Ct. at 577.

---

[1] The Defendants do not argue for a change of venue pursuant to 28 U.S.C. § 1404.

There is a split of authority among district courts in the Sixth Circuit regarding who bears the burden of proof when venue is challenged as improper. See Vizacher v. McAlees, No. 12–13985, 2013 WL 3270948, at *6 (E.D. Mich. June 27, 2013) (collecting cases); cf. 14D Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 3826 (3d ed. 2013) ("There are many cases . . . holding that the burden is on the objecting defendant to establish that venue is improper, because venue rules are for the convenience and benefit of the defendant. But the weight of judicial authority appears to be that when the defendant has made a proper objection, the burden is on the plaintiff to establish that the chosen district is a proper venue. This may be considered the better view because it is consistent with the plaintiff's threshold obligation to show that the case belongs in the particular district court in which suit has been instituted." (footnotes omitted)). Regardless of who bears the burden of proof, under Rule 12(b)(3), a plaintiff's well-pled allegations pertaining to the venue issue are taken as true, unless contradicted by a defendant's affidavits. 5B Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1352 (3d ed. 2013). In resolving venue questions, courts "may examine facts outside the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." Audi AG & Volkswagen of Am. v. Izumi, 204 F. Supp. 2d 1014, 1017 (E.D. Mich. 2002) (citing Moore v. AT & T Latin Am. Corp., 177 F. Supp. 2d 785, 788 (N.D. Ill. 2001); Solow Bldg. Co., LLC v. ATC Assocs., Inc., 175 F. Supp. 2d 465, 469 (E.D.N.Y. 2001)). See also 5B Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1352 (3d ed. 2013) ("A district court may examine facts outside the complaint to determine whether its venue is proper. And . . . the court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff.").

If a plaintiff asserts multiple claims against a defendant, venue must be proper as to each claim. Pioneer Surgical Tech., Inc. v. Vikingcraft Spine, Inc., No. 2:09-CV-271, 2010 WL 2925970, at *2 (W.D. Mich. July 21, 2010) (quoting Verbis v. Iowa Dept. of Human Servs., 18 F. Supp. 2d 770 (W.D. Mich. 1998); Basile v. Walt Disney Co., 717 F. Supp. 2d 381 (S.D.N.Y. 2010)). However, the principle of pendent or ancillary venue will permit "a claim that is not properly venued standing alone [to] be heard by a court as long as another properly venued claim arising out of a common nucleus of operative facts is also brought at the same time in the same district." Pacer Global Logistics, Inc. v. Nat'l Passenger R.R. Corp., 272 F. Supp. 2d 784 (E.D. Wis. 2003).

In the present case, the Plaintiff relies on § 1391(b)(2) as the basis for venue in the Southern District of Ohio. Under this provision, the Sixth Circuit has held that "[a] plaintiff may file his complaint in any forum where a substantial part of the events or omissions giving rise to the claim arose; this includes any forum with a substantial connection to the plaintiff's claim." First Michigan Corp. v. Bramlet, 141 F.3d 260, 263 (6th Cir. 1998). Consequently, venue may be proper in multiple districts under § 1391(b)(2). Id.; Capitol Specialty Corp. v. Splash Dogs, LLC, 801 F. Supp. 2d 657, 671–72 (S.D. Ohio 2011) (quoting Cunningham v. MEC Enters., Inc., No. 10–13409, 2011 WL 1869911, at *2 (E.D. Mich. Apr. 20, 2011)) ("The venue statute does not mandate that a plaintiff file a complaint where the most substantial events giving rise to the claim occurred. Without question, venue may be proper in two or more districts, even though most of the events occurred in only one of the districts."). This interpretation of § 1391(b)(2) is nonetheless limited by the section's substantiality requirement—only those acts or omissions with substantial, rather than tangential, connections to a plaintiff's claims can establish venue.

Sechel Holdings, Inc. v. Clapp, No. 3:12–CV–00108, 2012 WL 3150087, at *3 (W.D. Ky. Aug. 2, 2012) (citing Cottman Transmission Sys., Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994)).

In analyzing venue under § 1391(b)(2) in actions involving contract disputes, courts look to (1) where the contract was negotiated and executed, (2) where the contract was performed, and (3) where the alleged breach occurred. Parenteau v. Century Bank, No. 2:07–CV–851, 2008 WL 281626, *3 (S.D. Ohio Jan. 31, 2008) (citing Gulf Ins. Co. v. Glasbrenner, 417 F.3d 353, 357 (2d Cir. 2005)). Courts may also consider where the effects of a defendant's alleged breach are experienced. Sygnetics, Inc. v. Hops Int'l, Inc., No. 12–CV–14328, 2013 WL 1395806, at *3 (E.D. Mich. Apr. 5, 2013) (citing Cobasys, L.L.C. v. FMP Resistance Welding Supply, Inc., No. 07–13736, 2008 WL 162588, at *3 (E.D. Mich. Jan. 17, 2008))

Here, it is undisputed that the first and third factors do not establish a substantial connection between Ohio and the Plaintiff's claims. The Plaintiff is a resident of North Carolina, and the Defendants are residents of Pennsylvania. In negotiating and executing the alleged partnership agreement, the parties communicated with one another by telephone and e-mails, originating in Pennsylvania and North Carolina. Moreover, any breach of the alleged agreement (that is, a failure to share profits) occurred in Pennsylvania and the effects of that breach were felt in North Carolina.

Nonetheless, the Court finds that the second factor—the place of performance—does establish a substantial connection between Ohio and the Plaintiff's claims. In the performance of the alleged partnership agreement, the Defendants solicited oil and gas leases from Ohio leaseholders. Second Am. Compl. at ¶ 18. The Plaintiff in turn marketed deals on behalf of the partnership to various oil and gas companies with operations in Ohio in an effort to secure buyers for the partnership's leases. Id.

The alleged partnership's first transaction involved the transfer of oil and gas rights for land in the City of Girard, Ohio.[2] Id. at ¶ 20. On November 26, 2011, the net proceeds from the transaction were split three ways between the parties. Id. In the fall of 2011, the Defendants purchased approximately 4,400 acres of oil and gas rights in Monroe County,[3] Ohio from an Ohio limited liability company. Id. at ¶ 22. The Plaintiff then marketed the Monroe County leases and a number of smaller leases in Belmont County[4] to a variety of oil and gas companies. Id. at ¶ 23. On December 19, 2011, the Defendants conveyed the Monroe County leases to XTO/EXXON without notice to the Plaintiff. Id. at ¶ 26. Also in late 2011, the Defendants sold Belmont County leases without notice to the Plaintiff. Id.

In determining whether a substantial part of the events underlying a claim arose in a district, courts are split as to whether the focus on the activities of the defendants or both parties. 14D Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 3806 (3d ed. 2013). Here, the Defendants maintain that the Court "must focus on the activities of the defendant, not the plaintiff." Def.'s Mot. to Dismiss at 19, doc. 8 (citing Woodke v. Dahme, 70 F.3d 983, 985 (8th Cir. 1995) and Cottman Transmissions Systems, Inc. v. Martino, 36 F.3d 291, 294 (3d Cir. 1994)). The Plaintiff does not directly address this argument.

In First of Michigan Corp. v. Bramlet, the Sixth Circuit reversed the district court's decision dismissing the plaintiffs' action based on improper venue. 141 F.3d 260 (6th Cir. 1998). To determine whether a substantial part of the events underlying the plaintiffs' claim arose in the Eastern District of Michigan, the Sixth Circuit considered the actions of both the plaintiffs and the defendants. Id. at 264 ("Most of the transactions relating to the Bramlets' investments took

---

[2] The City of Girard is located in Turnbull County, which is part of the Northern District of Ohio.

[3] Monroe County is part of the Southern District of Ohio.

[4] Belmont County is part of the Southern District of Ohio.

place in Michigan or resulted from contact the Bramlets had with Sobol, who at all times conducted business in Michigan.") District courts in the Sixth Circuit have similarly considered both the plaintiff's and defendant's activities in analyzing whether venue is proper under § 1391(b)(2). See, e.g., Kelly Servs. v. Eidnes, 530 F. Supp. 2d 940, 949 (E.D. Mich. 2008) (considering the activities of the plaintiff and defendant under § 1391(b)(2)); Steelcase, Inc. v. Mar-Mol Co., Inc., 210 F. Supp. 2d 920, 937 (W.D. Mich. 2002) (same).

These cases suggest that the Court may look to the activities of the Plaintiff and the Defendants in this case to determine whether a substantial part of the events underlying the Plaintiff's claim arose in Southern District of Ohio. But even if the Court were only to consider the activities of the Defendant, it would still find that venue is appropriate here under § 1391(b)(2).

The performance of the alleged partnership agreement occurred in a number of locations, but in significant part in Ohio. The Defendants communicated and negotiated with Ohio corporations and citizens, purchased the oil and gas rights to Ohio land, and sold those oil and gas rights to other corporations with operations in Ohio. All of the profits accrued during the course of the alleged partnership were a result of buying and selling oil and gas rights in Ohio, predominantly in counties within the Southern District of Ohio. In the Court's view, these events establish a substantial connection between the Southern District of Ohio and the Plaintiff's claims.[5]

---

[5] Citing Onderik v. Morgan, 897 F.2d 204, 207 (6th Cir. 1989), the Defendants argue that under the "weight of contacts" test, venue is proper in the Western District of Pennsylvania. The Sixth Circuit has held that "[u]nder the 'weight of the contacts' test, venue would be proper in the district having the most significant ties to the claim." N. Ky. Welfare Rights Ass'n v. Wilkinson, 933 F.2d 1009, at *4 (6th Cir. 1991) (per curiam). However, the Sixth Circuit subsequently recognized that this approach was superseded by the 1990 amendment to § 1391(b)(2), which "render[ed] the Onderik standard obsolete." First of Michigan Corp., 141 F.3d at 263. Consequently, the Defendants' argument is meritless.

The Western District of Pennsylvania may also have substantial connections to the events underlying the Plaintiff's claims, but "[t]he venue statute does not mandate that a plaintiff file a complaint where the most substantial events giving rise to the claim occurred." NHCLC-Seattle, LLC v. Kauffman, No. 13–12804, 2013 WL 6474197, at *2 (E.D. Mich. Dec. 10, 2013). "[V]enue may be proper in two or more districts, even though most of the events occurred in only one of the districts." Capitol Specialty Corp., 801 F. Supp. 2d at 671–72 (citing Cunningham, 2011 WL 1869911, at *2). The Defendants are "not guaranteed a preferred venue, only a proper venue," NHCLC-Seattle, LLC, 2013 WL 6474197, at *2, and the Court finds that venue in the instant action is proper in the Southern District of Ohio.[6]

### III.    Motion to Dismiss for Failure to State a Claim

The Defendants contend that the Plaintiff's claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim because the Plaintiff failed to allege sufficient facts establishing the existence of a partnership under Ohio law.[7]

### A.    *Standard of Review*

Federal Rule of Civil Procedure 8(a) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion under Rule 12(b)(6) to dismiss a pleading for failure to state a claim,

---

[6] It is unclear whether the Defendants challenge venue as to all of the Plaintiff's claims or just those claims that sound in contract. The Court has found that venue is proper as to the Plaintiff's contract claims. Even if the Court were to find that venue was improper as to the Plaintiff's tort claims, the Court would nonetheless hear these claims under the pendent or ancillary venue doctrine. See Pacer Global Logistics, Inc. v. Nat'l Passenger R.R. Corp., 272 F. Supp. 2d 784 (E.D. Wis. 2003) (the principle of pendent or ancillary venue will permit "a claim that is not properly venued standing alone [to] be heard by a court as long as another properly venued claim arising out of a common nucleus of operative facts is also brought at the same time in the same district.").

[7] Although the majority of the Plaintiff's claims are dependent on the existence of a partnership, the Plaintiff's also bring a claim for unjust enrichment against the Defendants. Even if the Court were to dismiss the Plaintiff's partnership-related claims, it appears that the Plaintiff's unjust enrichment claim would survive the Defendants' Motions to Dismiss.

a court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court should construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true. Iqbal, 556 U.S. at 679; Erickson v. Pardus, 551 U.S. 89, 93–94 (2007); Twombly, 550 U.S. at 555–56.

Despite this liberal pleading standard, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; see also Twombly, 550 U.S. at 555, 557 ("labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do," nor will "naked assertion[s]" devoid of "further factual enhancements"); Papasan v. Allain, 478 U.S. 265, 286 (1986) (a court is "not bound to accept as true a legal conclusion couched as a factual allegation"). The plaintiff must provide the grounds of his entitlement to relief "rather than a blanket assertion of entitlement to relief." Twombly, 550 U.S. at 556 n.3. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679.

When the complaint does contain well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. Though "[s]pecific facts are not necessary," Erickson, 551 U.S. at 93, and though Rule 8 "does not impose a probability requirement at the pleading stage,"

Twombly, 550 U.S. at 556, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. Iqbal, 556 U.S. at 678-79; Twombly, 550 U.S. at 555–56. This inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]'– 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

As a general rule, when ruling on a Rule 12(b)(6) motion to dismiss, a district court may not consider matters outside the pleadings. Winget v. JP Morgan Chase Bank, N.A., 537 F.3d 565, 576 (6th Cir. 2008) (citing Kostrzewa v. City of Troy, 247 F.3d 633, 643 (6th Cir. 2001)). A district court may, however, consider "'exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein,' without converting the motion to one for summary judgment." Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 680–81 (6th Cir. 2011) (quoting Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008)). The Court considers the Defendants' Motions to Dismiss with these rules in mind.

B.     *Applicable Law*

"Federal courts sitting in diversity generally apply federal procedural rules and the substantive law of the forum state." Rupert v. Daggett, 695 F.3d 417, 423 (6th Cir. 2012) (citing City of Cleveland v. Ameriquest Mortg. Sec., Inc., 615 F.3d 496, 502 (6th Cir. 2010)). When

neither party raises a conflict of law issue in a diversity case, a federal court applies the law of the forum state. Lulaj v. Wackenhut Corp., 512 F.3d 760, 764 (6th Cir. 2008) (citing Wood v. Mid–Valley Inc., 942 F.2d 425, 426 (7th Cir. 1991)); see also Spectrum Cubic, Inc. v. Grant Prods. de Mexico, S.A. de C.V., — F. App'x —, 2014 WL 128606, at *2 n.7 (6th Cir. Jan. 15, 2014) (per curiam) (applying Michigan law where (1) parties made no arguments relating to choice of law issues; (2) the parties cited to Michigan law as controlling; and (3) the district court applied Michigan law); Koransky, Bouwer & Poracky, P.C. v. Bar Plan Mut. Ins. Co., 712 F.3d 336, 341 (7th Cir. 2013) (citing Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr., 692 F.3d 580, 587 n. 1 (7th Cir. 2012) ("We do not worry about conflict of laws unless the parties disagree on which state's law applies. Further, when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.")). Here, neither party raises choice of law questions concerning the Plaintiff's partnership claims. Instead, both parties cite and apply Ohio law as controlling the resolution of the Plaintiff's partnership claims. The Court will therefore apply Ohio law in this case. See Lulaj, 512 F.3d at 764.


C. *Discussion*

The Defendants argue that the Plaintiff's allegations are insufficient to establish a viable partnership claim under Ohio law. According to the Defendants, the Plaintiff has no written partnership agreement with them. In their view, the e-mails attached to the Plaintiff's Complaint demonstrate "something far short of a 'formal partnership' document and only underscore[] the absence of any meeting of the minds on the essential terms of the alleged partnership agreement." Def. Meffe's Mot. to Dismiss at 11, doc. 9. The Defendants also maintain that the parties' course of conduct demonstrates the lack of a partnership agreement—the parties did not

share profits, did not have mutuality of agency, did not have joint ownership of property, and were not treated as a partnership for tax purposes. Therefore, the Defendants conclude that the Plaintiff has failed to state a claim upon which relief may be granted.

In response, the Plaintiff asserts that the Defendants misrepresent Ohio partnership law. The Plaintiff cites the parties' e-mails as evidence demonstrating the intent of the parties to form the alleged partnership. According to the Plaintiff, after the May 31, 2011 e-mail exchange, the parties "actively worked together on over a dozen deals for the next six months, never questioning the terms of the partnership up to and after the first consummated deal." Pl.'s Resp. in Opp. at 7, doc. 22.

The Court is not persuaded by the Defendants' arguments. Under Ohio law, a partnership is "an association of two or more persons to carry on as co-owners a business for-profit formed under section 1776.22 of the Revised Code, a predecessor law, or a comparable law of another jurisdiction." Ohio Rev. Code § 1776.01(M). Section 1776.22 provides "any association of two or more persons to carry on as co-owners a business for-profit forms a partnership, whether or not the persons intend to form a partnership." Ohio Rev. Code § 1776.22(A). A partnership agreement is "[an] agreement among the partners concerning the partnership, whether written, oral, or implied." Ohio Rev. Code § 1776.01(N).

Courts consider a number of factors in determining the existence of a partnership, including: the sharing of profits, "the existence of a written or oral partnership agreement; the joint ownership and control of property; the ability of members to bind the business entity; and the nature of the tax returns filed by the business entity." In re Estate of Ivanchak, 862 N.E.2d 151, 155 (Ohio Ct. App. 2006). However, "'[s]ince every business relationship is unique, no single fact or circumstance can operate as a conclusive test for the existence of a partnership,'

14

particularly when the parties have dealt casually with each other." Id. (quoting In re Estate of Nuss, 646 N.E.2d 504, 507 (Ohio 1994)).

Although the Defendants emphasize that there is no written partnership agreement in this instance, under Ohio law, a partnership agreement is not required to be in writing. See Ohio Rev. Code § 1776.01(N) (defining a partnership agreement as "[an] agreement among the partners concerning the partnership, whether written, oral, or implied.").

The Defendants' better argument is that the Plaintiff has failed to allege sufficient facts demonstrating a "meeting of the minds" and that therefore no partnership was formed between the parties. According to the Defendants, the Plaintiff's Complaint and the e-mails attached as exhibits to the Complaint demonstrate the vague nature of any alleged partnership discussions between the parties. The Defendants point out that the parties "'discussed forming a more formal partnership'—suggesting some future action to be performed in the future, which would be formalized." Def. Meffe's Mot. to Dismiss at 11. Although the Plaintiff alleges that the parties confirmed their oral agreement through the exchange of written e-mails, the Defendants maintain that these e-mails "underscore[] the absence of any meetings of the minds on the essential terms of the alleged partnership agreement." Id. The Defendants note that Defendant Meffe's e-mail referred to an agreement "between [the parties'] respective companies." Id. In contrast, the Defendants observe, the Plaintiff's response referred to an agreement concerning a single transaction related to the Jefferson County leases and purportedly between the parties as individuals, rather than their companies. Id. at 11–12. Based on this comparison, the Defendants contend that the parties did not agree to the essential terms of the alleged partnership agreement.

If the Plaintiff's Complaint only included allegations of the May 31, 2011 phone call and e-mails, the Court would be inclined to agree with the Defendants' conclusion. The Plaintiff

alleges that on May 31, 2011, the Defendants called him and proposed forming a partnership and splitting the profits from that partnership equally. Second Am. Compl. at ¶ 12. Although the splitting of profits is indicative of a partnership, Ohio Rev. Code § 1776.22(C)(3), from the Plaintiff's account of the phone call it does not appear that the parties agreed to other essential terms of the alleged partnership agreement.

The e-mails between the parties are similarly ambiguous. Shortly after the phone conversation on May 31, Defendant Meffe e-mailed the Plaintiff, stating, "Bryan [the Plaintiff], list of names which you will need to understand the map. Should we have an agreement between our respective companies?" Exhibit C at 2, doc. 18-3. The Plaintiff responded, "Dom, Rick [the Defendants]: This e-mail is to confirm our understanding that we intend to split the profits on this transaction (Jefferson County leases) equally 3 ways between us – Thanks – Brian." Id. at 3. While Defendant Meffe referred to an agreement between the parties' companies (Wellington and Transact), the Plaintiff's response purported to confirm an agreement to work together as individuals to complete a single transaction (the sale of Jefferson County leases) and split the profits equally. In short, the Plaintiff's allegations concerning the May 31 phone call and the e-mail suggest a general intent to have an agreement between the parties, but the essential terms of that agreement are unclear based on the May 31, 2011 telephone call and e-mails.

Nonetheless, as alleged by the Plaintiff, the parties' course of conduct following May 31, 2011 is sufficient to demonstrate a "meeting of the minds" between the parties and to support the existence of an implied partnership agreement. See Crockett Homes, Inc. v. Hamilton, No. 2011–CA–00222, 2012 WL 1686188, at *7 (Ohio Ct. App. May 14, 2012) (citing Madden Inv. Co. v. Stephenson's Apparel, 832 N.E.2d 780, 782 (Ohio Ct. App. 2005)) ("A court may find an implied partnership from the totality of attendant facts and circumstances"). Under Ohio law,

"'[a] court can properly find a partnership exists from evidence that there has been a sharing of net profits from a continuing business operated by two or more persons, where each is capable of binding the business entity.'" Ivanchak, 862 N.E.2d at 155 (quoting Simandl v. Schimandle, 445 N.E.2d 734, 736 (Ohio Ct. App. 1982)).  Here, the Plaintiff explicitly alleges that, after six months of working together to buy, market, and sell oil and gas leases throughout Eastern Ohio, the parties split the profits from the City of Girard transaction. Significantly, "[a] person who receives a share of the profits of a business is presumed to be a partner in the business[.]"[8] Ohio Rev. Code § 1776.22(C)(3).

Further, as alleged by the Plaintiff, the totality of facts and circumstances support a finding that the Plaintiff was a co-owner of a continuing business with the Defendants. Construing the Complaint in the light most favorable to the Plaintiff and accepting all well-pleaded material allegations in the Complaint as true as the Court must, Iqbal, 556 U.S. at 679, the parties worked together from June through December 2011 to buy, market, and sell oil and gas rights in Eastern Ohio. The parties communicated with one another on a daily basis to discuss potential business deals and to calculate prospective profits from those deals. Second

---

[8] Unless the profits were received in payment for any of the following:

    (a) A debt by installments or otherwise;

    (b) Services as an independent contractor or wages or other compensation to an employee;

    (c) Rent;

    (d) An annuity or other retirement or health benefit to a beneficiary, representative, or designee of a deceased or retired partner;

    (e) Interest or other charge on a loan, even if the amount of payment varies with the profits of the business, including a direct or indirect present or future ownership of the collateral, or rights to income, proceeds, or increase in value derived from the collateral;

    (f) The sale of the goodwill of a business or other property by installments or otherwise.

Ohio Rev. Code § 1776.22(C)(3).

Am. Compl. at ¶ 21. While the Defendants bought and sold the actual oil and gas leases, the Plaintiff (1) marketed at least twelve oil and gas deals to various energy companies, id. at ¶ 18; (2) secured buyers for approximately eight of those deals, id.; and (3) obtained multiple letters of intent from buyers on behalf of the alleged partnership, id. at ¶ 20. Most significantly, as the Plaintiff became more active in the alleged partnership, "[the Defendants] had very little or no direct contact with the leaseholders as [the Plaintiff] increasingly handled both sides of the transactions directly." Id. at ¶ 18. Drawing all reasonable inferences in favor of the Plaintiff, the Plaintiff's conduct as described above, particularly handling both sides of various transactions, was consistent with that of a co-owner of a business.[9]

The Court concludes that the Plaintiff has alleged sufficient facts to support his partnership claims. As alleged by the Plaintiff, the parties worked together on numerous oil and gas transactions and split the profits from the City of Girard transaction which creates the presumption under Ohio law that the Plaintiff was a partner in business with the Defendants. The totality of the facts and circumstances in this case buttress this presumption as the Plaintiff's behavior was consistent with that of a co-owner. Consequently, the Court will deny the Defendants' Motion to Dismiss for Failure to State a Claim.

## IV.  Motion to Dismiss or Stay Proceedings Pending Arbitration

---

[9]     The Defendants argue that the Plaintiff has not alleged sufficient facts demonstrating the Plaintiff's mutual agency and control over partnership business. Based on its review of the Plaintiff's allegations as discussed above, the Court disagrees with this argument. The Plaintiff alleges that he marketed deals, secured buyers, obtained letters of intent, and handled both sides of partnership transactions. In the Court's view, these allegations are sufficient to establish the mutual agency and control associated with a co-owner of a business.

The Defendants also emphasize that the alleged partnership was not treated as a partnership for tax purposes. But it is well-established that "'no single fact or circumstance can operate as a conclusive test for the existence of a partnership,' particularly when the parties have dealt casually with each other." Ivanchak, 862 N.E.2d at 155 (quoting Nuss, 646 N.E.2d at 507).

The Plaintiff's claims in the present case concern the buying, marketing, and selling of oil and gas leases in Eastern Ohio in furtherance of the alleged partnership between the parties in their individual capacities. Specifically, the Plaintiff claims that the Defendants breached the alleged partnership agreement when the Defendants failed to split the profits from the sale of 4,400 acres oil and gas leases in Monroe County (the Massey Assets) and 600 acres of oil and gas leases in Belmont County (the Belmont Assets) with him.

The Defendants argue that the Plaintiff's partnership claims are covered by the Co-Brokerage Agreement and are subject to the Agreement's arbitration clause. Although difficult to follow at times, the Defendants appear to argue that: (1) Wellington and Transact are necessary and indispensable parties under Rule 12(b)(7) and Rule 19 of the Federal Rules of Civil Procedure; (2) the Co-Brokerage Agreement between Wellington and Transact covers any claims related to the Defendants' sale of the Massey Assets and Belmont Assets; and (3) despite being a nonsignatory to the Co-Brokerage Agreement, the Plaintiff is nonetheless bound by the Agreement's arbitration clause.

According to the Plaintiff, the alleged partnership agreement at issue in this case was between the parties in their individual capacities and did not involve Wellington and Transact. Further, the Plaintiff emphasizes the alleged partnership agreement was separate and apart from the Co-Brokerage Agreement and therefore any claims related to the alleged partnership agreement are not subject to the Co-Brokerage Agreement's arbitration clause.

A.      *Rule 12(b)(7) and Rule 19*

The Defendants' briefs contain numerous references to Rule 12(b)(7) and Rule 19. At the outset of his Motion to Dismiss, Defendant Meffe "moves to dismiss the Complaint against him

on three grounds," specifically (1) failure to state a viable partnership claims; (2) the Plaintiff's claims are subject to arbitration pursuant to the Co-Brokerage Agreement between Wellington and Transact; and (3) improper venue. Def. Meffe's Mot. to Dismiss at 1–2. However, throughout his Motion to Dismiss, Defendant Meffe repeatedly refers to Wellington and Transact as necessary and indispensable parties. See id. at 1, 2, 9, 14, 15, 16–17. According to Defendant Meffe:

> [a]pplying a Rule 12(b)(7) and 19 necessary and indispensable party analysis to Reilly's failure to join Wellington and Transact, underscores the need for the companies and their principals to [be] joined in a set of unified arbitration proceedings if the overriding goal of efficiency in arbitration and avoidance of a piecemeal dispute resolution is to be achieved.

Id. at 16. Defendant Meffe asserts that Transact and Wellington are necessary parties because full adjudication of the claims alleged in this action requires their presence. Id. at 16–17. It is unclear whether Defendant Meffe's Rule 12(b)(7) and Rule 19 analysis is presented to the Court to illustrate the need for unified arbitration proceedings or if Defendant Meffe presents it as an independent ground for dismissing the instant case.

Unlike Defendant Meffe, Defendant Hoffman explicitly seeks "dismissal of the Complaint for failure to join an indispensable party pursuant to FRCP 12(b)(7)." Def. Hoffman's Mot. to Dismiss at 1, doc. 11. Although Defendant Hoffman does not provide any briefing of his own, he incorporates by reference Defendant Meffe's memorandum in support of his Motion to Dismiss. Id. at 2.

The Plaintiff does not address the Defendants' Rule 12(b)(7) and Rule 19 analysis in his Response.

Federal Rule of Civil Procedure 12(b)(7) provides that a party may move for dismissal based on the "failure to join a party under Rule 19." "Assessing whether joinder is proper under

Rule 19 is a three-step process." <u>Glancy v. Taubman Ctrs., Inc.</u>, 373 F.3d 656, 666 (6th Cir. 2004) (citations omitted). "First, the court must determine whether the person or entity is a necessary party under Rule 19(a)." <u>Id.</u> (citing <u>Temple v. Synthes Corp. Ltd.</u>, 498 U.S. 5, 8 (1990)). "Second, if the person or entity is a necessary party, the court must then decide if joinder of that person or entity will deprive the court of subject matter jurisdiction." <u>Glancy</u>, 373 F.3d at 666 (citing <u>W. Md. Ry. Co. v. Harbor Ins. Co.</u>, 910 F.2d 960, 961 (D.C.Cir.1990)). "Third, if joinder is not feasible because it will eliminate the court's ability to hear the case, the court must analyze the Rule 19(b) factors to determine whether the court should 'in equity and good conscience' dismiss the case because the absentee is indispensable." <u>Glancy</u>, 373 F.3d at 666 (quoting <u>W. Md. Ry. Co.</u>, 910 F.2d at 961). "Thus, a person or entity is only indispensable, within the meaning of Rule 19, if (1) it is necessary, (2) its joinder cannot be effected, and (3) the court determines that it will dismiss the pending case rather than proceed in the case without the absentee." <u>Glancy</u>, 373 F.3d at 666 (citations and quotations omitted).

Federal Rule of Civil Procedure 19(a) states:

**(a) Persons Required to Be Joined if Feasible**

**(1) Required Party.** A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or

> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

>> (i) as a practical matter impair or impede the person's ability to protect the interest; or

>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

A "necessary" party must be joined if feasible—if they are "subject to service of process" and would "not deprive the court of subject-matter jurisdiction." Fed. R. Civ. P. 19(a). If a court determines that a party is not "necessary" under Rule 19(a), "joinder, as well as further analysis, is unnecessary." Local 670, et. al. v. Int'l Union, et. al., 822 F.2d 613, 618 (6th Cir. 1987).

The burden is on the moving party to establish that a party is necessary for purposes of Rule 19(a). Marshall v. Navistar Intern. Transp. Corp., 168 F.R.D. 606, 611 (E.D. Mich. 1996); 5C Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1359 (3d ed. 2013) (recognizing that the burden is on a party making a Rule 12(b)(7) motion to establish that missing parties are "necessary" or "indispensable" to the action). "The moving party may satisfy this burden through the production of affidavits or other relevant extra-pleading evidence." Lewis v. Ceralvo Holdings, LLC, No. 4:11–CV–55–JHM, 2012 WL 32607, at * (W.D. Ky. Jan. 6, 2012) (citing Potawatomi Indian Tribe of Okla. v. Collier, 17 F.3d 1292, 1293 (10th Cir. 1994)). See also 5C Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1359 (3d ed. 2013) ("To discharge this burden, it may be necessary to present affidavits of persons having knowledge of these interests as well as other relevant extra-pleading evidence").

The Defendants have not met their burden here. In contrast to the rest of their well-written and thorough brief, the Defendants' Rule 12(b)(7) and Rule 19 analysis consists of legal conclusions unsupported by facts or legal argument. The Defendants cite various sections of Rule 19(a) and assert that Wellington and Transact are necessary parties without providing an explanation of why they are, in fact, necessary parties. Nor do they cite case law or present facts that would support the Court making such a finding. The Court includes this section of the Defendants' brief to illustrate this conclusion:

> Transact and Wellington are "necessary" parties under **all** three factors enumerated in Rule 19(a). First, Transact and Wellington are "necessary" parties because complete relief cannot be accorded among the parties without Transact and Wellington's presence in this lawsuit. <u>See</u>, Fed.R.Civ.P. 19(a)(1). As explained above, the Massey transaction which is at issue in this case was run through Wellington, and therefore will possess relevant information which are inextricably intertwined with the claims and defenses in this action. <u>See</u> Complaint ¶20. Second, unless Wellington and Transact are made parties, they may be unable to protect their potential interest in the Ohio oil/gas interests from the deals in Ohio. <i>See</i> Fed.R.Civ.P. 19(a)(2)(i). Finally, there is a substantial risk that Meffe and Hoffman, as existing parties will be subject to multiple or inconsistent obligations unless Transact and Wellington, the absent parties are joined in this suit. <u>See</u> Fed.R.Civ.P 19(a)(2)(ii). Simply put, full adjudication of the claims alleged in this action requires the presence of Transact and Wellington.

Def. Meffe's Mot. to Dismiss at 17 (errors in original).[10] Because the Defendants have not supported their assertion that Wellington and Transact are necessary parties with arguments or facts sufficient to satisfy its burden as the moving party, the Court will deny the Defendants' request to join Wellington and Transact as necessary parties in the instant case. Moreover, to the extent that the Court construes the Defendants' Motions to Dismiss as requesting dismissal of the case pursuant to Rule 12(b)(7), the Court will deny that request.


B.    *Co-Brokerage Agreement*

The Defendants argue that the Plaintiff's partnership claims fall within the scope of the Co-Brokerage Agreement between Wellington and Transact and that the Plaintiff, a nonsignatory to the Co-Brokerage Agreement, is bound by the Agreement and its arbitration clause because he seeks a direct benefit from the Agreement. Citing the Co-Brokerage Agreement, the Defendants explain that it refers to natural gas and oil interests in several counties in Ohio, including

---

[10] The Defendants' Rule 19(b) analysis is similarly conclusory. <u>See</u> Def. Meffe's Mot. to Dismiss at 17 ("While Wellington and Transact are necessary parties, their joinder would be problematic because they agreed to arbitrate their claims in the Co-Brokerage Agreement, and their joinder would frustrate the broad policy in favor of efficient and streamline arbitration under the Federal Arbitration Act . . . by subjecting them to multiple and possibly inconsistent adjudications in both arbitral and judicial forums. Under Rule 19(b), if a necessary party cannot be joined, and the Rule 19(b) factors are applicable, then the party is deemed to be 'indispensable,' and the action cannot proceed in their absence and must be dismissed.")

Belmont, Monroe, Noble, Washington, Jefferson, Carroll, and Harrison Counties. The Defendants emphasize that "[t]he Massey transaction which Reilly claims as a basis for its claims against Meffe and Hoffman involve properties in Monroe County, Ohio, which is specifically listed as part of the Co-Brokerage Agreement." Defs.' Mot. to Dismiss at 15, doc. 9.

In response, the Plaintiff asserts that the Defendants arbitration claim is frivolous. In the Plaintiff's view, the Co-Brokerage Agreement concerned an unrelated transaction between Wellington and Transact, corporate entities that are not parties to this dispute.

In reply, the Defendants reiterate that the broad language of the Co-Brokerage Agreement requires the arbitration of the Plaintiff's claims in this case. The Defendants emphasize that there is no specific exclusion in the Co-Brokerage Agreement for the Plaintiff's individual partnership claims.

On January 31, 2011, Transact and Wellington executed a Co-Brokerage Agreement (Ex. 1, doc. 18-1) that promised Transact 2% of the total transaction price of the sale of Beck Energy Corporation assets if Transact identified and presented a successful buyer of those assets. Second Am. Compl. at ¶ 8. The Agreement states in part:

> This agreement is entered into by and between – Wellington Resource Group, LLC (Owner) and Transact Partners International, LLC (Selling Broker) concerning "Ohio Natural Gas and Oil Interests," including but not limited to 54.4 square miles of prime natural gas leases, 249 producing oil and gas wells (shallow), 2 drilled Marcellus Shale wells, 50 acres headquarter site with office building, substantial well head and operating machinery, includes gathering lines from all operating wells, developed access to major trunk gas pipelines. Leased assets include 17,157 acres of land held by production and an additional 17,675 acres of undeveloped leases. The entire package of properties and leases lies within the following Southeastern Ohio counties: Belmont, Monroe, Noble, and Washington Counties. In addition, this agreement shall include approximately 15,000 acres of land in the Utica shale, specifically in the following counties: Jefferson, Carroll, Harrison, and Belmont. Both properties are currently listed for sale by Selling Broker for the consideration as hereinafter expressed[.]

Co-Brokerage Agreement at 2, doc. 18-1. The Agreement includes an arbitration clause, which provides, "Any action or dispute between the Owner and Selling Broker, shall, at the option of either party, be determined by arbitration administered by the National Arbitration Association, under its Commercial Arbitration Rules." Id. at ¶ 14.

The Court will deny the Defendants' request to compel arbitration for several reasons. First, the Plaintiff's Complaint indicates that his claims are based on an alleged partnership agreement between the parties in their individual capacities rather than the Co-Brokerage Agreement. As pled in the Complaint, the Co-Brokerage Agreement is a separate and distinct agreement from the alleged partnership agreement.

Second, a review of the plain language of the Co-Brokerage Agreement and the evidence submitted by the parties demonstrates that the Plaintiff's claims in the instant case concern properties, the Massey Assets and Belmont Assets, that are unrelated to the Co-Brokerage Agreement. On its face, the Co-Brokerage Agreement concerns the sale of two packages of properties and leases in Eastern Ohio by Wellington and Transact, non-parties in the instant case. Co-Brokerage Agreement at 2. The Agreement describes in general terms the location and acreage of the properties and provides specific details about the assets (wells, buildings, operating machinery, etc.) located on those properties. Id. Those properties were listed for sale by Transact (the Selling Broker) as of January 31, 2011. See id. ("Both properties are *currently* listed for sale by Selling Broker for the consideration as hereinafter expressed" (emphasis added)).

Here, the Plaintiff's claims center on the sale of the Massey Assets and Belmont Assets, located in Monroe and Belmont County respectively. It is certainly true that the two packages of properties identified in the Co-Brokerage Agreement included property in Monroe and Belmont

County. See Co-Brokerage Agreement at 2 ("The entire package of properties and leases lies within the following Southeastern Ohio counties: Belmont, Monroe, Noble, and Washington Counties. In addition, this agreement shall include approximately 15,000 acres of land in the Utica shale, specifically in the following counties: Jefferson, Carroll, Harrison, and Belmont."). However, there is nothing in the Co-Brokerage Agreement and nothing in the record that suggests the Massey Assets and the Belmont Assets were part of the two packages of properties listed for sale by Transact as of January 31, 2011 pursuant to the Agreement.

It is undisputed that the Defendants, through Wellington, did not acquire the Massey Assets until after August 8, 2011. See Binding Letter of Intent Concerning Massey Assets at 7, doc. 18-6 (dated August 8, 2011 and agreeing to acquire the Massey Assets subject to verifying that the leases to the Massey Assets were in full force and effect). Consequently, because the Massey Assets were not acquired by any of the parties or their related corporate entities until after August 8, 2011, they could not have been listed for sale as of January 31, 2011, the date the Co-Brokerage Agreement was executed. Therefore, the sale of the Massey Assets was not covered by the Co-Brokerage Agreement or the Agreement's arbitration provision. Further, nothing in the plain language of the Co-Brokerage Agreement, the Plaintiff's Complaint, or the evidence submitted by the parties demonstrate that Belmont Assets are related to the Co-Brokerage Agreement.

Third, the Defendants have failed to explain why the Plaintiff is bound by the Co-Brokerage Agreement. The Defendants are correct that nonsignatories may be bound to an arbitration agreement. A signatory to an agreement containing an arbitration clause may compel a nonsignatory to arbitrate pursuant to an arbitration agreement under ordinary contract and agency principles. Javitch v. First Union Sec., Inc., 315 F.3d 619, 629 (6th Cir. 2003) (citing

Arnold v. Arnold Corp., 920 F.2d 1269, 1281 (6th Cir.1990)). "Five theories for binding nonsignatories to arbitration agreements have been recognized: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel." Javitch, 315 F.3d at 629 (citing Thomson–CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir.1995)). Conversely, a signatory can be compelled to arbitrate at the nonsignatory's insistence "because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations." Thomson–CSF, 64 F.3d at 779 (citation and quotation marks omitted).[11]

Here, however, the Plaintiff and the Defendants are both nonsignatories to the Co-Brokerage Agreement.[12] In Invista S.À.R.L. v. Rhodia, S.A., the Third Circuit considered whether a nonsignatory to an arbitration agreement could compel another nonsignatory to submit to arbitration:

> Rhodia, S.A. contends that three INVISTA entities who are the plaintiffs in this litigation—all of whom are non-signatories to the JVA containing the arbitration clause—can each be compelled to arbitrate the claims they asserted against Rhodia S.A. in the district court. Although Rhodia S.A. correctly notes that non-

---

[11] "The test for determining whether a nonsignatory can force a signatory into arbitration is different from the test for determining whether a signatory can force a nonsignatory into arbitration." CD Partners, LLC v. Grizzle, 424 F.3d 795, 799 (8th Cir. 2005).

> [I]t matters whether the party resisting arbitration is a signatory or not. . . . [A] willing nonsignatory seeking to arbitrate with a signatory that is unwilling may do so under what has been called an alternative estoppel theory which takes into consideration the relationships of persons, wrongs, and issues, [b]ut a willing signatory seeking to arbitrate with a non-signatory that is unwilling must establish at least one of the five theories described in [Thomson–CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995)].

Merrill Lynch Inv. Managers v. Optibase, Ltd., 337 F.3d 125, 131 (2d Cir. 2003). "[A]rbitration is more likely to be attained when the party resisting arbitration is a signatory." Amisil Holdings Ltd. v. Clarium Capital Mgmt., 622 F. Supp. 2d 825, 831 (N.D. Cal. 2007) (citing CD Partners, LLC, 424 F.3d at 799; Merrill Lynch Inv. Managers, 337 F.3d at 131; Thomson-CSF, 64 F.3d at 779).

[12] The Defendants have failed to demonstrate that Transact and Wellington are necessary parties under Rule 19. Consequently, the signatories to the Co-Brokerage Agreement, Transact and Wellington, are not parties in the present case.

> signatories can be compelled to arbitrate under the doctrines of equitable estoppel and/or assumption, the argument overlooks the rather crucial fact that Rhodia did not sign any agreement to arbitrate the claims either. Not surprisingly, Rhodia, S.A. offers no authority for its contention that a non-signatory to an arbitration agreement can compel another non-signatory to arbitrate certain claims, and we have found none.

625 F.3d 75, 85 (3d Cir. 2010). Therefore, absent legal authority not presently before the Court, it appears that the Defendants cannot invoke the arbitration provision in the Co-Brokerage Agreement against the Plaintiff, a fellow nonsignatory.

## V. Motions to Strike

In response to the Defendants' Motions to Dismiss, the Plaintiff filed a series of motions entitled "Motion to Strike [the Defendant's] Motion to Dismiss Amended Complaint, or in the Alternative, Response in Opposition." See docs. 22, 23, and 25. In these Motions, the Plaintiff takes issue with the Defendants' inclusion of new facts not found in his Second Amended Complaint. According to the Plaintiff, the new facts introduced by the Defendants "are totally inappropriate in the context of a 12(b)(6) [motion] and show a clear lack of understanding or respect for the Federal Rules of Civil Procedure. Pl.'s Resp. at 3, doc. 22. Therefore, the Plaintiff argues, the Court should strike these new facts from the Defendants' motions.

The Plaintiff is correct that these facts should not be considered in ruling on a 12(b)(6) motion, and the Court has not considered them for purposes of the Defendants' 12(b)(6) motions in this case. Therefore, the Plaintiff's Motions to Strike will be denied as moot.

## VI. Conclusion

For the foregoing reasons, the Court (1) DENIES the Defendants' Motions to Dismiss (docs. 8, 11, 15, 19, 20, 24) and (2) DENIES AS MOOT the Plaintiff's Motions to Strike (docs. 22, 23, 25).

IT IS SO ORDERED.

<u>S/ James L  Graham</u>
James L. Graham
UNITED STATES DISTRICT JUDGE

Date: March 19, 2014